[Civ. No. 6597. Third Dist. July 28, 1941.]

PALM SPRINGS–LA QUINTA DEVELOPMENT COMPANY (a Corporation), Plaintiff and Appellant, v. KIEBERK CORPORATION (a Corporation), Respondent; EDWARD GLICK et al., Cross-Defendants and Appellants.

KIEBERK CORPORATION (a Corporation), Respondent, v. PALM SPRINGS–LA QUINTA DEVELOPMENT COMPANY (a Corporation) et al., Appellants.

S. W. Newman and I. B. Kornblum for Appellants.

I. B. Kornblum for Appellant Walter Hast.

Pacht, Pelton, Warne & Black and Isaac Pacht for Respondent.

THOMPSON, J.—This is an appeal from a judgment rendered in two consolidated cases denying reformation of a contract and awarding the Kiener Corporation damages of $6,500 for conversion of personal property, together with attorneys' fees in the sum of $7,000.

The first suit sought to reform a contract with relation to the custody and use of 27,000 "lead cards" and cabinets, together with trade information therein contained to be used for procuring sales of real property. The contract is attached to the complaint and marked Exhibit "A". To that complaint the Kieberk Corporation, which was succeeded by the Kiener Corporation, filed an answer and cross-complaint, seeking possession of the cards, damages for detaining them and counsel fees pursuant to a stipulation contained in the contract.

The second cause of action by the Kieberk Corporation was to replevin the cards and cabinets and for damages for appropriation and loss thereof, together with an application for injunction to prohibit the disposition or use of the cards, and for counsel fees pursuant to the stipulation contained in the contract. Answers and cross-complaints were filed by the interested parties to this proceeding.

The suits were consolidated for trial. The trial of the actions consumed forty-five days. The printed transcript contains 1333 pages of pleadings, proceedings and evidence. The court adopted findings favorable to the Kieberk Corporation in every material respect. Judgment was rendered accordingly, denying reformation of the contract, determining that the Kiener Corporation is the owner and entitled to possession of the lead cards and cabinets, and awarding it damages in the sum of $6,500 for the appropriation and loss of 2,000 of the master cards, together with $7,000 attorneys' fees. From that judgment this appeal was perfected.

The appellants contend that the findings and judgment are not supported by the evidence; that the court erred in denying reformation of the contract; that the damages awarded for the loss of lead cards is excessive and that the amount allowed as attorneys' fees is also excessive.

From 1925 to January, 1936, Harry Kiener was engaged in promoting the subdivision and sale of several tracts of real property in Southern California. He resided in Los Angeles. For that purpose he organized successive corporations. The first corporation was called the Kieberk Corporation, of which he was president, manager and sole owner. Subsequently he organized the Kiener Corporation, which became the successor of the Kieberk Corporation, and the owner of all its property and assets. He also organized certain auxiliary corporations which were conducted as recreational clubs to which large numbers of individuals were induced to join with fishing, hunting, swimming and golfing privileges. They were all conducted under the primary management of Mr. Kiener and his organizations. His object in organizing the recreational clubs was to procure prospective purchasers of acreage and lots of land in the various subdivisions which he was promoting. One of these subdivisions was called the La Quinta Tract near Palm Springs in Riverside County, which was handled by the plaintiff, Palm Springs-La Quinta Development Company, under contract. It sold numerous lots to the

customers of the Kiener Corporation by means of the information derived from the card system belonging to the respondent company. These sales were made on installment contracts. In January, 1936, the unpaid installments on those contracts amounted in the aggregate to $350,000. The Palm Springs Company then owed the Kiener Corporation $40,000 as its share of the proceeds of sales.

In the management of the Kiener organizations and in the subdivisions and sales of lots a detailed system of indexed members and prospective purchasers was installed in cabinets, including some 27,000 cards and a similar number of duplicates thereof, with the names, residences, financial standing, prospect of sales and status of contracts of each member. These cabinets were kept in the office of the Kiener Company in the National City Bank Building at Number 508 South Spring Street in Los Angeles.

In January, 1936, Mr. Harry Kiener became ill and contemplated the necessity of retiring from active business. The contract of the Palm Springs-La Quinta Development Company, with respect to the subdivision of land and the sale of lots, together with its realty business, was assigned by it February 1, 1936, to the defendants Louis N. Berkowitz, Walter Hast, Frank Stone and Edward Glick for a period of ten years, together with the lease of the office above referred to, in which the filing cabinets and index cards were kept. As a part of that transaction and incident thereto the agreement marked Exhibit "D", the construction of which furnishes the chief controversy of this litigation, was executed February 14, 1936, by the respective parties to the previously mentioned assignment of contract, and by Harry Kiener, as President of the Kieberk Corporation. The agreement of February 14th recites that the 27,000 original index cards and the cabinets in which they are contained in the office at number 508 of the bank building above referred to are not sold or conveyed to the Palm Springs-La Quinta Development Company, but, on the contrary, that it is permitted to use them and the data therein contained only for the limited purpose and in the manner specifically mentioned in the contract. That agreement then provides that:

"Said lead cards and cabinets may at any time be removed and taken from your office or any other place where such may happen to be by the Kieberk Corporation, with or without

demand; further, that you [the Palm Springs Corporation] agree to keep the lead cards and cabinets free from any destruction or improper use or any use other than above stipulated.''

Finally, the agreement stipulates that the Kieberk Corporation shall be entitled to recover ''a reasonable attorney's fee for services rendered,'' together with costs and damages, in any action necessarily maintained with respect to the ownership, title or possession of the index cards and cabinets.

■ We are entirely satisfied the court did not err in refusing to reform the agreement dated February 14, 1936, with respect to the ownership and use of the index cards and cabinets. The language of that document appears to be too clear and explicit to leave any doubt regarding the intention of the respective parties thereto concerning the ownership, right of possession or use of the so-called lead cards.

While there is a conflict of testimony regarding the ownership and use of the index cards, there is ample evidence in the record to support the findings and judgment that the Kiener Corporation ''is the sole and exclusive owner of . . . lead cards, and entitled to the possession thereof, the information thereon set forth, and the cabinets in which the lead cards were contained.'' The very agreement, which was signed by all of the appellants, clearly indicates that fact.

■ We are unable to say the award of damages in the sum of $6,500 for the destruction or loss of 2,000 master lead cards and the misuse of the index card system contrary to the terms of the agreement of February 14, 1936, is excessive. The contract restricts the use of information derived from the lead cards to sales of real property to ''members of the Peter Pan Woodland Club,'' or to ''sell properties at La Quinta'' belonging to the Palm Springs Land and Irrigation Company or to the Big Bear Land and Water Company. This limitation of the use of the cards was specified in the contract for the reason that the Palm Springs Company was then indebted to the Kiener Corporation in the sum of $40,000 and it was interested in the consummation of sales of those particular properties. That card system had been perfected by Mr. Kiener and his corporation at great expense over a long period of time. The sales of lots or the use of the information contained in the cards for the benefit of other realty firms, or for the disposition of other properties would naturally diminish the chance of selling or consummating sales of

the particular properties to members of the organizations represented by the index card system. That misuse of the cards contrary to the terms of the agreement was a proper element to consider in determining the amount of damages. The court not only found that the appellants had lost, destroyed or appropriated 2,000 master cards and 15,500 duplicate cards, but also that they knowingly and wilfully ''have used and continue to use, the lead cards and the information thereon contained in a manner not designated and agreed upon in said agreement, and in violation thereof.'' There is substantial evidence to support those findings.

█ It satisfactorily appears that the system of index cards was acquired by the respondent at a very great expense during a long period of time by organizing and securing thousands of members of different recreational clubs. The names of members of the various clubs, together with valuable information regarding sales of lots or prospects for such sales, their financial standing, the names of agents and the dates of interviewing members and status of contracts were recorded on separate master cards, which were alphabetically arranged in appropriate cabinets. Duplicate cards were also kept in other cabinets. There is ample evidence that the Kieberk Corporation expended thousands of dollars in procuring the information from which these cards were made. They furnished the information from which sales and contracts for installment sales of lots were made, aggregating a sum approximating a million dollars. Large numbers of these conditional sales are incompleted. Some of the purchasers were in default of stipulated payments. Many of the cards contained names of members of clubs to whom no property had been sold. Access to the cards and the information therein contained is most valuable and necessary to complete contracts of sales as well as to furnish information for other good prospects for sales. There is ample evidence from which it may be estimated the preparation of the master cards cost the Kieberk Corporation in excess of $3.25 per card, and that they are reasonably worth that sum of money. The court found that 2,000 of those master cards had been lost or destroyed by the appellants and that the respondent was damaged thereby in the sum of $6,500. No damages were allowed for the loss of some 15,000 duplicate cards. The damages allowed for the loss of the master cards amounts to only $3.25 apiece.

We are of the opinion there is ample evidence to support that finding and award.

In support of their contention that damages will not lie for the appropriation, loss or conversion of a list of customers, together with information which may constitute such individuals valuable prospects for sales of real property, they rely on the case of *Olschewski* v. *Hudson,* 87 Cal. App. 282 [262 Pac. 43]. It was a suit for damages against an agent of a laundry company, founded on an alleged conversion of a laundry route by a purported sale of a specified district in San Francisco to a competing laundry company. The trial court held that the complaint failed to state a cause of action. The plaintiff refused to amend his complaint after a demurrer thereto had been sustained. The appellate court sustained the judgment which was accordingly rendered. The court merely held that while the property rights of a laundry company to trade knowledge possessed by its agent would be protected in an appropriate proceeding, a mere laundry district in a specified locality does not constitute such tangible property rights as may be subject to an action in trover or conversion. No cabinet of index cards or specific list of customers was involved in that action. The court said in that regard:

"It is not affirmatively alleged that he had a list or memorandum of the names of customers, either written or otherwise, or that he had access to any such list."

The defendant in that case was not charged with converting an index list of customers. He was charged with selling the good-will of a business in a specified district. This court merely held that was an intangible property right which is not susceptible of conversion.

In the present case the appellants were charged with damages for destroying and appropriating tangible personal property consisting of a cabinet of lead cards containing the names and valuable information regarding prospective and actual purchasers of real property, contrary to the express terms of a written contract. There is a clear distinction between these cases. The Olschewski case is not in point.

We may not hold, under the circumstances of this case, that the trial court abused its discretion in allowing the respondent $7,000 as attorneys' fees for defending the action. The contract of February 14, 1936, which is attached to the complaint and marked Exhibit "D", stipulates to "a reason-

able attorney's fee for services'' rendered in any litigation involving the property in question. The pleadings in the action to replevin the ''lead cards'' and cabinets, and in the suit involving the construction of the contract above referred to are unusually lengthy and involved. A temporary restraining order was also issued. The chief issue was the ownership and right of possession of those cards and cabinets. The settling of the issues and the trial of the cause consumed about forty-five days of actual court work. The printed transcript on appeal contains 1333 pages. Numerous counsel represented various parties to the actions. The cause was strenuously contested. The record indicates that the legal services in question must have been reasonably worth the sum allowed by the court. The rule is thoroughly established that a trial court is vested with sound discretion to fix the value of attorneys' fees in litigation pending before it, and that its judgment regarding the sum which is deemed to reasonably compensate counsel therefor will not be disturbed in the absence of clear and apparent abuse of discretion. (*Los Angeles* v. *Los Angeles-Inyo Farms Co.,* 134 Cal. App. 268, 274 [25 Pac. (2d) 224] ; *Hedden* v. *Waldeck,* 9 Cal. (2d) 631, 639 [72 Pac. (2d) 114].)

In determining what constitutes a reasonable attorneys' fee the court may take into consideration not only the amount or value of the property involved, but also the intricacy and importance of the litigation, the labor and necessity for skilled legal training and ability in drawing the pleadings and trying the cause and the time consumed therein. (3 Cal. Jur. 697, sec. 96.) In the present case it is evident that a high degree of legal skill was necessary on the part of respondent's attorney to meet the contentions of numerous adverse counsel. The quality of the legal services which were rendered and the unusual length of time consumed in the litigation certainly merit the allowance of a considerable sum of money as attorneys' fees. We are of the opinion the sum which was allowed is not excessive.

The judgment is affirmed.

Tuttle, J., and Pullen, P. J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 25, 1941.